UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-cr-157 (TNM) |
| CHRISTIAN SECOR, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Christian Secor at the midpoint of his guidelines range to 57 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

I.   INTRODUCTION

The defendant, Christian Secor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Secor attended the Stop the Steal rally on the downtown mall on January 6, and then joined the crowd that marched to the U.S. Capitol. He entered the Senate Wing door of the Capitol building at approximately 2:26 p.m., approximately 13 minutes after it was initially breached. He subsequently walked through the Crypt, walked to the second floor of the building, through the office suite of Speaker of the House Nancy Pelosi, to the Rotunda and found himself at the East Rotunda doors. At approximately 2:38 p.m., Secor assisted a group of rioters inside the building to push against those doors, which were being guarded by three Capitol Police officers. The group of rioters overpowered the officers, opened the doors, and assisted fellow rioters who entered the building.

Secor then walked up the stairs to the Senate gallery, which he entered at approximately 2:42 p.m. He sent a photograph of his hand with the Senate dais in the background to another individual. He then went down to the floor of the Senate, where he mounted the Senate Dais and sat in the seat that had been occupied by Vice President Mike Pence approximately 30 minutes earlier. While Secor occupied the seat at the Senate Dais—and while other rioters were present inside the Senate Chamber and the U.S. Capitol building—the joint session to count and certify the votes of the Electoral College for the 2020 Presidential Election could not continue. Secor subsequently left the Capitol building.

After the events at the Capitol, Secor posted many Tweets to Twitter, including "It was Trump supporters you losers, and you should be proud. One day accomplished more for conservativism than the last 30 years." After January 8, 2021, Secor deleted his Twitter account. Secor also asked the individual to whom he texted the photograph from the Senate gallery to delete the photo. The individual complied. The phone Secor used while at the Capitol had its last known

2

cell site activity on January 17, 2021, and was not recovered by law enforcement officials who executed a warrant to search his home on February 16, 2021.

The government recommends that the Court sentence defendant Secor to 57 months' incarceration, which is within the advisory Guidelines' range as correctly calculated by Probation Office of 51-63 months. This sentence reflects the gravity of Secor's conduct, but also acknowledges his admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, defendant Secor among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 Presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 21-cr-054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR and the Statement of Offense incorporated into Secor's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate

3

chambers to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* Statement of Offense ¶¶ 2-9; PSR ¶¶ 18-24.

*Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 21-cr-054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See*

*id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.     Secor's Role in the January 6, 2021 Attack on the Capitol**

*Secor's Actions Before January 6, 2021*

Secor, a former student at UCLA and the president of America First Bruins, was one of the thousands who descended on the U.S. Capitol on January 6, 2021. His crimes are documented

through a series of videos provided to the FBI by concerned citizens, surveillance footage from inside of the Capitol, and open-source videos taken by others on the grounds that day. Secor's Twitter and iCloud accounts provided further evidence of his intent when traveling to the Capitol on that particular day.

Prior to January 6, Secor had several conversations via text message regarding what he perceived as a stolen or rigged 2020 Presidential election. On November 3, 2020, Secor sent a text message stating "We're gonna win bigly and if we don't we're taking this ship down in flames." On November 4, 2020, Secor sent a text message stating "They're cheating. Trump will pull through by legal or illegal means." Secor similarly posted his views about what he perceived as a stolen Presidential election on Twitter. On November 4, 2020, Secor tweeted "They are stealing the election. If we allow them to, we deserve to live under their tyranny. What will you do, little man? Will you take it, accept it, kneel?" On November 5, 2020, Secor tweeted "Any Republican governor who doesn't begin drafting articles of secession if the election is stolen is a traitor to their constituents."

Secor traveled to Washington, D.C. from his home in southern California, flying into Reagan National Airport on January 5, 2021. Secor messaged another individual on January 5, 2021, stating that he "brought a gas mask" to D.C. because he "expect[s] [expletive] to go sideways" and "people are pissed, burning thin blue line flags, I heard that Journos had targets on their back last time and that'll be amplified this time. Wouldn't be surprised if conservatives just storm the police and clobber antifa and the police but that's wishful thinking." On that same day, Secor tweeted "The façade of a free country are [sic] evaporating before our eyes. What an exciting time to be alive[.]" In response to a Tweet stating that the app "Maps" was disabling directions to

Washington D.C. ahead of the Trump Rally on the 6th, Secor also stated "The institutional attacks on this demonstration are something out of the Arab Spring. More reason to go by any means necessary!"

On January 6, 2021, Secor attended the "Stop the Steal" rally and thereafter marched with other protesters to the U.S. Capitol. Secor was carrying a large blue flag with the letters "AF" in a white circle inside the flag, a symbol of the America First organization.[2] Secor wore a red ball cap with the same "AF" emblem on a sticker on the bill of the hat.

### *Secor Ascends the NW Staircase and Enters the Capitol*

Secor then approached the Capitol Building, scaled the northwest scaffolding on the Capitol grounds, and ascended the northwest staircase to the Upper West Terrace of the Capitol at approximately 2:17 p.m. *See* Exhibit 1, USCP Surveillance Video Northwest Staircase, at 17:25 minutes. The scaffolding was located at the western face of the Capitol building. The following is a still image from Exhibit 1. Defendant Secor is circled in red.

---

[2] America First is described in detail *infra* at 33-34.



*Video Still from Exhibit 1*

Secor reached the Upper West Terrace at approximately 2:20 p.m., only a few minutes after rioters had first broken into the Senate Wing Door at approximately 2:13 p.m. Capitol Police officers continued to block some entrances to the building, but the large number of rioters overwhelmed the few officers present on the Terrace. *See* Exhibit 2, Open Source Video from Parler, at 18:00 minutes. Secor entered a ramp towards the Senate Wing Door, as a rioter on a bullhorn shouted "they can't stop us all!" *See* Exhibit 2, Open Source Video from Parler, at 19:34 minutes. As Secor and other rioters streamed into the building, the mob stomped on the entrance ramp, yelling "take it back! Take it back!" *See* Exhibit 2, Open Source Video from Parler, at 20:50 minutes. The alarm blared, and the glass in the doorway was clearly broken, as Secor and other rioters flooded inside. *See* Exhibit 2, Open Source Video from Parler, at 21:06 minutes.



*Video Still from Exhibit 2*

***Secor Enters the Capitol, Traverses Through Speaker Pelosi's Office Suite, and Arrives at the Rotunda***

Secor entered the U.S. Capitol building at 2:26:28 p.m. *See* Exhibit 3, USCP Surveillance Video Senate Wing Door, at 26:28 minutes.  This time is significant; not 30 seconds earlier, Vice President Mike Pence and his family were removed from his visiting office near the Senate chamber, and evacuated to a secure location inside the U.S. Capitol Grounds, due to the rioters who had breached the building.  *See* Exhibit 4, USCP Surveillance Camera.



*Video Still Exhibit 3, at 2:26:28 p.m.*



*Video Still Exhibit 4, at 2:26:02 p.m.*

Once inside the building, Secor made his way to the Crypt, exiting towards the House

side Memorial Door entry at approximately 2:30 p.m.  *See* Exhibit 5, USCP Surveillance Camera

House Side Entry, at 4:29 minutes.

11



*Video Still from Exhibit 5, at 2:30:29 p.m.*

Secor then made his way through the Crypt, to the House side of the building, and up a staircase to the second floor. He then walked through the office suite of the Speaker of the House, Nancy Pelosi. *See* Exhibit 6, USCP Surveillance Footage House Side Second Floor, and Exhibit 7, Video from defendant Kevin Lyons, at 6:00 minutes through 8:20 minutes.



*Video Still Exhibit 6, at 2:33:24 p.m.*



*Video Still Exhibit 7, at 8:19 minutes*

### *Secor Joins The Push Against The East Rotunda Doors*

After leaving the Speaker's Suite, Secor next went through the Rotunda of the Capitol to the East Rotunda doors. Once at the East Rotunda doors, at approximately 2:38 p.m., Secor helped a group of rioters inside the building push open those doors, which were being guarded by three Capitol Police officers. *See* Exhibit 8, USCP Surveillance Footage East Rotunda Doors. The group of approximately 30 rioters threw their weight against the doors, which Secor joined by bracing his body against the backs of other rioters as they pushed. In the process, the crowd trapped three Capitol Police officers against the doors. The rioters ultimately overpowered the officers, and Secor and his fellow rioters assisted the rioters on the outside of the Capitol enter the building. *See* Exhibit 9, Video from defendant Ronald Sandlin, at 1:55-2:05 minutes.



*Video Still from Exhibit 8, at 2:38:28 p.m.*

### *Secor Enters the Senate Chamber*

Secor then walked up the stairs to the third floor of the Capitol building and followed other rioters down the hallway to the Senate Gallery. At approximately 2:42 p.m., Secor and other rioters entered the Gallery of the Senate chamber. *See* Exhibit 9, defendant Ronald Sandlin video; Exhibit 10, USCP Surveillance Video Senate Third Floor.



*Video Still Exhibit 10, 2:41:54 p.m.*

Secor sent a photo in a text message to Witness 1 from inside the Senate Gallery, showing his own hand in the image and the Senate Dais in the background. The photo was taken at approximately 2:43 p.m. Shortly after January 6, 2021, Secor asked Witness 1 to delete the photo he sent from the Senate Gallery, and Witness 1 complied. *See* Exhibit 11, Photograph from defendant Secor's iCloud account.



*Exhibit 11*

At approximately 2:47 p.m., after another rioter had jumped over the railing in the Senate

Gallery to the Senate Floor, Secor left the Gallery and went to the door of the Senate Floor on the

second story of the Capitol building. Secor entered the Senate Floor at approximately 2:48 p.m.

Secor then made his way to the Senate Dais and sat in the seat that had been occupied by Vice

President Mike Pence approximately 30 minutes earlier. *See* Exhibit 12, A Reporter's Footage

from Inside the Capitol Siege, *The New Yorker;* Exhibit 13, Senate Floor Camera 6.



*Video Still Exhibit 12, at 4:27 minutes*

16



*Video Still from Exhibit 13, at 14:49:03*



*Video Still from Exhibit 13, at 14:49:35*

While Secor occupied the seat at the Senate Dais—and while other rioters were present inside the Senate Chambers and the U.S. Capitol building—the joint session to count and certify the votes of the Electoral College for the 2020 Presidential Election obviously could not continue. Secor then left the Senate floor and exited the Capitol building at approximately 2:51 p.m., after 25 minutes inside. *See* Exhibit 14, USCP Surveillance Camera.



*Video Still for Exhibit 14, at 2:51:39 p.m.*

On the evening of January 6, 2021, Secor tweeted "They did want a color revolution…" and "Feds working with antifa." Secor also tweeted at NewsMax and Sean Spicer, after Spicer released a statement condemning the violence at the Capitol grounds, stating "It was Trump supporters you losers, and you should be proud. One day accomplished more for conservativism than the last 30 years and all the normie [sic] have to say is denial. You boomers will kill our republic." On January 7, 2021, Secor retweeted a video with the caption "Election? Stolen. Patriots? Condemned. Protesters? Executed. Blood? Barely Dry" and responded "Pence looks like he's realizing mistakes were made in his judgment." After January 8, 2021, Secor deleted his Twitter accounts, including all of the above-mentioned Tweets about January 6, 2021 and the 2020 Presidential Election.

On January 12, 2021, Secor texted another individual a screenshot of a Tweet from @LibertyHangout announcing that the FBI and DOJ will pursue sedition charges against the U.S. Capitol Rioters, with a sentence of 20 years.  On January 17, 2021, the iPhone XR used by Secor while on the grounds of the Capitol had its last known cell site activity between 2:27 p.m. and 2:37

p.m. in Newport Beach, California.  Law enforcement officials who executed a warrant to search of Secor's residence on February 16, 2021 never recovered that phone. On January 23, 2021, Secor, using a new Samsung phone and phone number, texted another individual the message "my fb doesn't have anything btw," referring to information on his Facebook page about his presence at the U.S. Capitol on January 6, 2021 and his opinions on the 2020 Presidential Election. The other individual responded, "no the page you made" and "I thought you were trying to delete everything?" Secor responded "I'll delete it today."

### III.   THE CHARGES AND PLEA AGREEMENT

On November 10, 2021, a federal grand jury returned a superseding indictment charging Secor with Obstruction of an Official Proceeding Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2; Civil Disorder Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3), 2; Assaulting, Resisting, or Impeding Certain Officers Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(1), 2; Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Entering and Remaining on the Floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A); Entering and Remaining in the Gallery of Congress, in violation of 40 U.S.C. § 5104(e)(2)(B); Entering and Remaining in Certain Rooms in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(C); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On May 19, 2022, Secor pled guilty to Count One, Obstruction of an Official Proceeding Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2.

## IV.    STATUTORY PENALTIES

Secor now faces sentencing on Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2). As noted by the plea agreement and the presentence report, Secor faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years. PSR ¶ 91.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Probation Office calculated Secor's Gudelines range as follows:

Count One: 18 U.S.C. §§ 1512(c)(2), 2[3]

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **27** |

---

[3] The parties have agreed in the Plea Agreement that U.S.S.G. § 2J1.2(a) is the correct base offense level and that U.S.S.G. § 2J1.2(b)(2) and U.S.S.G. § 3C1.1 apply in this case. *See* Plea Agreement at ¶ IV(A). The parties also agreed that the Congressional proceeding on January 6, 2021 constitutes the administration of justice. *See id.*

Acceptance of responsibility (U.S.S.G. §3E1.1)                                        -3

**Total Adjusted Offense Level:**                                                  **24**

*See* PSR ¶¶ 46-57; Plea Agreement at ¶ IV(A).

The U.S. Probation Office correctly calculated Secor's criminal history score as zero and category as I. PSR ¶ 60. Accordingly, based on the Probation Office's calculation of Secor's total adjusted offense level, after acceptance of responsibility, at 24, Secor's Guidelines range is 51 to 63 months' of imprisonment. PSR ¶ 92.  Secor's plea agreement contains an agreed-upon Guidelines range calculation that mirrors Probation's, but allows Secor to argue that the enhancement in U.S.S.G.  2J1.2(b)(1)(B) does not apply because, as a matter of fact, his offense did not involve causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice. *See* Plea Agreement at ¶IV(A). The parties agreed that the Congressional proceeding on January 6, 2021 constitutes the administration of justice. *Id.*

A. **Enhancements Regarding the Administration of Justice Should Apply.**

United States Sentencing Guidelines ("USSG") § 2J1.2, which applies to the "Obstruction of Justice," provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2). Secor has argued in his objections to the PSR that neither of these specific offense characteristics is applicable to his conduct in this case. He primarily asserts that his actions on January 6, 2021 did not relate to the "administration of justice," because they did not involve the interference with an

21

investigation, evidence, or court resources. PSR, at pages 22-23.

Secor has waived the argument that the certification of the Electoral College vote does not amount to the "administration of justice "under USSG § 2J1.2 by so stipulating in his plea agreement. *See* Plea Agreement at ¶IV(A). Any argument that those enhancements do not apply "runs headfirst into [Secor's] plea agreement where he stipulated that … the enhancement[s] should apply." *United States v. Flynn*, 969 F.3d 873, 882–83 (8th Cir. 2020), *cert. denied*, 210 L. Ed. 2d 960, 141 S. Ct. 2853 (2021). Secor's "assent to the plea agreement containing stipulations on the enhancements is dispositive." *United States v. Taylor*, 909 F.3d 889, 895 (7th Cir. 2018). "Plea agreements are contracts, and the inclusion of specific terms demonstrates the result of negotiations. *Id*. (citation omitted). "Accordingly, if a defendant knowingly agreed to relinquish a specific right in exchange for concessions from the government, then that right has been intentionally abandoned and thus waived." *Id*. (cleaned up). *Accord, United States v. Serrano-Beauvaix*, 400 F.3d 50, 54 (1st Cir. 2005) (defendant "waived his challenge to his organizer role enhancement" when he stipulated in the plea agreement that he "helped [another codefendant] contact and recruit a police officer to assist in the escort of the cocaine shipment" and that his "offense level would be adjusted upwards by two levels under § 3B1.1 because he 'recruited one of his co-defendants.'"); *United States v. Cianci*, 154 F.3d 106, 110 (3d Cir. 1998) (rejecting challenge to Guidelines enhancement; "Under the law of this circuit, Cianci cannot renege on his agreement" so "we rejected a defendant's attempt to dispute a stipulation regarding the appropriate sentencing range."). *See also United States v. Laslie*, 716 F.3d 612, 614 (D.C. Cir. 2013) (enforcing a plea agreement stipulation that the obstruction of justice enhancement applied where defendant "knowingly entered into a plea agreement with the government in which he stipulated that he

obstructed justice by instructing witnesses to lie to federal agents"; and affirmed at sentencing "that the district court should use the enhancement in calculating his Guidelines range").[4]

Permitting Secor to argue against the enhancements here would be particularly unfair given that the government agreed to drop all charges other the violation of Section 1512(c)(2) in return for, inter alia, his agreement that the certification amounted to the administration of justice and that his offense resulted in a substantial interference with the administration of justice. Otherwise, the government could have countered that he would have to plead guilty to additional charges, which would authorize a higher total sentence in the event that this Court concluded that the enhancements did not apply.

In addition to being waived, the argument lacks merit. Secor fails to account for U.S.S.G. § 2J1.2's text and commentary. *See* U.S.S.G. § 1B1.1(b) ("The court shall then consider … any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence."). Section 2J1.2's commentary provides a broad definition of "administration of justice." It defines the term "[s]ubstantial interference with the administration of justice" to include "a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based on perjury, false testimony, or other false evidence; or *the unnecessary expenditure of substantial governmental or court resources*." USSG § 2J1.2 cmt. n.1 (emphasis added). This definition goes well beyond "a judicial or grand jury proceeding" to include the unnecessary expenditure of substantial "governmental" resources. *Id.* And because

---

[4] Notably, in *Laslie*, the D.C. Circuit did not hold that its waiver finding required that the defendant not challenge a stipulation at sentencing. Thus, a determination here that Secor cannot challenge the enhancements he agreed would apply, even though he attempts to do so in his sentencing submissions, would not run afoul of *Laslie*, and would be consistent with the authority from other Circuits cited above.

note 1 is part of the commentary of § 2J1.2 "that interprets or explains a guideline," it is "authoritative unless [the commentary] violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

Other courts have applied U.S.S.G. § 2J1.2(b)(2) to proceedings that would not fit Secor's narrow definition of the "administration of justice." See *United States v. Ali*, 864 F.3d 573, 574 (7th Cir. 2017) (upholding the application of § 2J1.2(b)(2) after law enforcement officials expended substantial resources to recover the defendant's children he kidnapped and transported internationally); *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180, 205-08 (D.N.J. 2009) (applying § 2J1.2(b)(2) after a defendant interfered with OSHA investigations into a workplace accident); *United States v. Weissman*, 22 F. Supp. 2d 187, 194-98 (S.D.N.Y. 1998) (applying § 2J1.2(b)(2) after a defendant withheld subpoenaed documents from a congressional subcommittee); *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (upholding the application of § 2J1.2(b)(2) where defendant's "scheme and lies caused a substantial waste of resources, including hundreds of hours of work from the investigators") (citing *United States v. Johnson*, 485 F.3d 1264, 1271–72) (11th Cir. 2007)); *United States v. Meredith*, 602 F. App'x 102, 103 (4th Cir. 2015) (same); *United States v. Tankersley*, 296 F.3d 620, 623–24 (7th Cir. 2002) (same); *United States v. Harrington*, 82 F.3d 83, 87 n.2 (5th Cir. 1996), *as modified on reh'g* (Apr. 17, 1996) (same); *United States v. Voss*, 82 F.3d 1521, 1532 (10th Cir. 1996) (same)).

Although the commentary defines only the term "substantial interference with the administration of justice" in U.S.S.G. § 2J1.2(b)(2), and not the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B), Secor offers no sound reason to interpret

the same term in two specific offense characteristics in the same guideline differently. The relevant term in both provisions, "administration of justice," is identical. And the operative verbs, "interfere[]" and "obstruct," carry the same meaning in this context. The adjective "substantial" does not change the meaning of "administration of justice," especially since the commentary repeats the word, requiring "the unnecessary expenditure of substantial governmental . . . resources." U.S.S.G. § 2J1.2 cmt. n.1. Thus, the term "in order to obstruct the administration of justice" in U.S.S.G. § 2J1.2(b)(1)(B) should be read to include obstructive conduct aimed at nonjudicial governmental activities. A different conclusion would lead to a result of two different meanings for the term "administration of justice" within the same guideline.

The definition of "administration of justice" in § 2J1.2 cmt. n.1 is consistent with the term's ordinary meaning, which can encompass the application or execution of any law, including the laws relating to the electoral certification. One meaning of "justice," for example, is "[t]he fair and proper administration of laws." Black's Law Dictionary (11th ed. 2019) (definition 4). And some cases have defined "administration of justice" to mean "the performance of acts or duties required by law," *Rosner v. United States*, 10 F.2d 675, 676 (2d Cir. 1926) (quotation omitted), or "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed," *United States v. Partin*, 552 F.2d 621, 641 (5th Cir. 1977). The electoral certification easily falls within this broad understanding of "administration of justice," because it involved Congress's performance of duties required by law. *See* U.S. Const. art. II, § 1, cl. 3; 3 U.S.C. §§ 15-18.

Further, U.S.S.G. § 2J1.2 applies to an array of obstruction statutes, including a number that do *not* involve the "administration of justice" in the narrow sense that Secor advocates (i.e.,

relating to judicial proceedings). *See* U.S.S.G. § 2J1.2 cmt.; U.S.S.G. Appendix A; 18 U.S.C. §§ 551 (concealing or destroying invoices or papers relating to imported merchandise); 665(c) (obstructing an investigation under the Workforce Innovation and Opportunity Act); 1505 (obstruction of proceedings before departments, agencies, and committees), 1511 (obstruction of enforcement of state gambling laws), 1512 (obstruction of official proceedings), 1516 (obstruction of a federal audit), 1519 (destruction of documents in agency investigations); 26 U.S.C. § 7212 (interfering with the administration of the Internal Revenue Code). Yet, under Secor's interpretation of the guideline, enhancements under §§ 2J1.2(b)(1)(B) and (b)(2) would not apply to any of those statutes.

"A principal purpose of the Sentencing Guidelines is to promote uniformity in sentencing imposed by different federal courts for similar criminal conduct." *Hughes v. United States*, 138 S. Ct. 1765, 1774 (2018). The Guidelines therefore seek to achieve "a strong connection between the sentence imposed and the offender's real conduct." *United States v. Booker*, 543 U.S. 220, 246 (2005). Consistent with this purpose, U.S.S.G. § 2J1.2 sets forth several specific offense characteristics that provide sentencing courts with tools to adequately address the "[n]umerous offenses of varying seriousness" that "may constitute obstruction of justice." U.S.S.G. § 2J1.2 cmt. Background. The Sentencing Commission quite reasonably determined that obstructing justice by causing or threatening injury or property damage is more serious and deserves greater punishment. And causing or threatening injury to obstruct a congressional proceeding is just as serious as doing so to obstruct judicial proceedings. To avoid making §§ 2J1.2(b)(1)(B) and (b)(2) inapplicable to many of the statutes for which the guideline was designed, the commentary's broad definition of "administration of justice" should apply, as its text makes clear, beyond just judicial proceedings.

The Supreme Court has made clear that a term can have a different meaning in the Sentencing Guidelines than it does in a statute. *DePierre v. United States*, 564 U.S. 70, 87 (2011). And, as noted above, the guideline here (unlike 18 U.S.C. § 1503) includes its own definition focused on the "administration of justice," which covers "governmental *or* court" resources and intentionally applies to a wide variety of obstruction statutes, of which 18 U.S.C. § 1503 is but one.

In *United States v. Rubenacker*, 21-cr-193 (BAH), the Chief Judge found that the defendant's argument that the phrase "the administration of justice" is limited to the activities of courts or grand juries unpersuasive. See *United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 62:3-6. Citing the U.S. Supreme Court decision in *United States v. Aguilar*, 515 U.S. 593 (1995), and specifically Justice Scalia's concurring opinion, the Court found that the omnibus clause was one of the several distinct and independent prohibitions contained in § 1503 and explained Justice Scalia's understanding that were the due administration of justice to apply only to judicial and grand jury proceedings would render it superfluous. Thus, both the majority opinion and the concurrence by Justice Scalia, clearly understood the due administration of justice to be a much broader category that included but was not limited to judicial proceedings referenced in this statute at Section 1503. See *United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 63:1-18. Additionally, the Court noted that terms may and regularly do carry different definitions when appearing in a statute versus a guideline. *DePierre v. United States*, 564 U.S. 70, 88 (2011). Yet, the "trappings" of the January 6 certification of the electoral college vote, did, in fact, have the features that easily fall within the contours of the phrase

"administration of justice": a formal hearing before an official body, that requires the Congress to convene and conduct official business, consider objections, and render a final decision, at a specific time, hour and place, with the Vice President as the presiding officer. See *United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 65:24-66:22.

To the extent Secor suggests that the challenged enhancements pre-date Congress's addition of the term "official proceeding" to 18 U.S.C. § 1512, that is incorrect. Although Congress added § 1512(c) in 2002 in the Sarbanes-Oxley Act, the definition of an "official proceeding" was enacted in 1982, before the sentencing guidelines were promulgated in 1984. *See* Victim and Witness Protection Act of 1982 (VWPA), Pub. L. No. 97-291, 96 Stat. 1248, 1249-50. It cannot be the case that Congress simply overlooked the application of specific offense characteristics for defendants who substantially interfere with, or cause or threaten to cause physical injury or property damage in order to obstruct a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), or a "proceeding before a Federal Government agency," § 1515(a)(1)(C), or a "proceeding involving the business of insurance," § 1515(a)(1)(D). The Chief Judge agreed with this analysis in *Rubenacker*: "A straightforward, chronological understanding of the statute and the guideline leads to the contrary conclusion that the defendant reaches; specifically, that Section 2J1.2, and its SOC enhancements, are applicable to all of the statutes to which it specifically references, including all convictions under 18 U.S.C. Section 1512, including those arising from obstruction of official proceedings of Congress." See *United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 67:16-23.  This Court should not read the guidelines to create such a gap.

Notably, there are judges on this Court who have applied at least one, and sometimes both, of the "administration of justice" enhancements in the context of the Capitol breach on January 6, in cases where the parties agreed to their application. *See, e.g.*, *United States v. Duke Wilson*, No. 21-cr-345 (Lamberth, J.); *United States v. Paul Hodgkins*, No. 21-cr-188 (Moss, J.); *United States v. Scott Fairlamb*, No. 21-cr-120 (Lamberth, J.); *United States v. Jacob Chansley*, No. 21-cr-003, (Lamberth, J.); *United States v. Matthew Miller*, No. 21-cr-075 (Moss, J.); *United States v. Gregory Rubenacker*, No. 21-cr-193 (Howell, C.J); *United States v. Guy Reffitt*, No. 21-cr-032 (Friedrich, J.). Probation therefore correctly rejected defendant Secor's objections to the applicability of the "administration of justice" enhancements here. PSR at pages 23-24.

## B.  The Enhancement Regarding Injury or Property Damage Should Apply as a Factual Matter

Probation also correctly concluded that both enhancements apply to Secor's conduct. PSR at ¶¶ 48-49, pages 23-24. Secor was in the United States Capitol for half an hour, as part of a violent mob of people who assaulted officers and damaged property—all while Congress was, by law, required to be engaged in a joint session to certify the Electoral College vote of the 2020 presidential election. Inside, he joined a group of rioters that threw their collective body weight against three Capitol Police officers, who were guarding the East Rotunda doors. *See* Exhibits 8 and 9. Those three officers were slowly surrounded by dozens of rioters. Rioters at the front of the line tried to reach past the officers to open the door to the outside, where dozens of other rioters were waiting, in plain view of those inside the Capitol. *See* Exhibit 8.  Secor joined with other rioters in throwing his weight, for approximately 12 seconds, on the backs of other rioters, trapping one of the officers between the rioters and the door jamb, and ultimately opening the doors guarded by the officers to allow the rioters outside to stream in. *See* Exhibit 8. As rioters from the outside

flooded in, Secor retreated briefly, but then returned to the melee, to throw his weigh on the backs of fellow rioters who had targeted another officer who was blocking the path of rioters outside the building. *See* Exhibit 8.  Once the mob removed the officer from the doorway, dozens more rioters were able to enter through those doors. *See* Exhibit 8. Within 90 seconds, six members of the Oath Keepers entered through the now-open door.  *See* Exhibit 8.  All of this conduct resulted in "substantial interference with the administration of justice," because it contributed to the "unnecessary expenditure of substantial governmental . . . resources," warranting the enhancement under U.S.S.G. § 2J1.2(b)(2). And the physical and violent manner in which Secor substantially interfered with the administration of justice warrants additional punishment.

The Chief Judge also addressed a factual challenge to the application of U.S.S.G. § 2J1.2(b)(1)(B) in *Rubenacker* based on that defendant's argument that his actions on January 6, 2021, did not cause or threaten physical injury to any person or damage any property. In *Rubenacker*, the defendant joined the mob that chased U.S. Capitol Police Officer Eugene Goodman up the stairs outside of the Senate Chamber, refused to leave the building when officers in the Ohio Clock Corridor tried to disperse the crowd, joined in a face-off confrontation with officers in the Rotunda, and sprayed liquid from a plastic water bottle at an officer. *See United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 56:19-59:19. Chief Judge Howell determined that all of this conduct was relevant, and was indeed threatening towards the multiple police officers protecting the Capitol and members of Congress during the certification of the 2020 Electoral College vote, rendering the provision applicable. *See United States v. Gregory Rubenacker*, 21-cr-193 (BAH), Sentencing Hearing Tr. 60:7-20.

Similarly, all of Secor's conduct noted above threatened officers defending the Capitol, and likely led to physical injury of another or property damage. Additionally, all of this conduct contributed to the delay of the Congressional proceeding which did not restart until about 8:00 p.m., after police officers and National Guard soldiers removed every rioter from the building. Thus, all of Secor's conduct on January 6, 2021 is relevant conduct, and it satisfies both enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2). *See* U.S.S.G. § 1B1.3 ("Unless otherwise specified, . . . specific offense characteristics . . . shall be determined on the basis of . . . *all* acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . [and] all harm that resulted from the acts and omissions specified . . . above, and all harm that was the object of such acts and omissions.").

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a sentence of 57 months.  That is the appropriate sentence under § 3553(a) even if the Court determines that the two enhancements discussed above do not apply.

### A.   Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in

American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the U.S. Capitol building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While evaluating Secor's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Secor's crimes weigh heavily towards a significant term of incarceration. Several aggravating factors are at play in Secor's conduct that support this

request. First, as described above, Secor gained access to two particularly sensitive areas of the Capitol building: Speaker of the House Nancy Pelosi's Office Suite, and the Senate Chamber floor. Second, Secor participated in a violent push with other rioters against the East Rotunda doors, trapping three Capitol Police officers and opening a door to the outside that let dozens of rioters inside the Capitol.[5] Third, Secor bragged on social media about the attack on the Capitol. And finally, Secor deleted evidence of his crimes, and encouraged others to do the same.  In short, Secor's extreme conduct on January 6, involving not only his physical exertions in overcoming police efforts to prevent rioters from spilling through the Rotunda Doors, but his invasion of the Senate Chamber and planting himself in the chair of the President of the Senate, were egregious efforts to prevent the certification vote.

### B.  Secor's History and Characteristics

Secor's history and characteristics—including his affiliation with extreme political ideologies, ready access to weapons, and the tools to potentially build firearms— favor a lengthy term of incarceration. Secor is a follower of Nicholas Fuentes, Fuentes's live-stream show and corresponding socio-political movement "America First," and was the President of UCLA's America First Bruins organization. Nicholas Fuentes is a public figure known for making racist statements, celebrating fascism, and promoting white supremacy.[6]  Recovered Tweets from defendant Secor's now-deleted Twitter account, @fullautonat, relay similar extremist sentiments:

---

[5] To be clear, had Secor personally engaged in additional violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of particularly violent or destructive acts on Secor's part is therefore not a mitigating factor.
[6] https://www.splcenter.org/fighting-hate/extremist-files/individual/nick-fuentes



Most concerning, however, is how America First's founder spread false information about the 2020 Presidential election, encouraged overturning the results election, and urged adherents to "storm every state capitol until January 20, 2021, until President Trump is inaugurated for four more years."[7] On January 7, 2021, Fuentes championed the January 6th attack on the Capitol on Twitter.[8] Similarly, following his actions at the Capitol on January 6th, Secor expressed victory on

---

[7] https://january6th.house.gov/sites/democrats.january6th.house.gov/files/2022-1-19.BGT%20Letter%20to%20Fuentes%20-%20Cover%20Letter%20and%20Schedule_Redacted2.pdf

[8] https://january6th.house.gov/sites/democrats.january6th.house.gov/files/2022-1-19.BGT%20Letter%20to%20Fuentes%20-

Twitter, writing "It was Trump supporters you losers, and you should be proud. One day accomplished more for conservativism than the last 30 years and all the normie have to say is denial. You boomers will kill our republic."

Alongside his apparent support of political violence, Secor's ready access to weapons is troubling. Upon execution of the search warrant of Secor's residence and vehicle on February 16, 2021, law enforcement officials found three knives and a baton in defendant Secor's vehicle, mace and body armor plates in Secor's bedroom, and a privately manufactured "ghost gun" in a gun safe in the house.[9] At the time, defendant Secor had one legally registered .22 caliber rifle in his name. But a ghost gun, by its nature, cannot be legally registered with state authorities because there is no gun dealer to register the purchase and no serial number to track the firearm.

Additionally, video recovered from a Go-Pro camera recovered in the search of the premises shows Secor in possession of an AR-style rifle, pointing the weapon inside his residence while wearing a tactical helmet.[10] This firearm was not found in the home when the search was conducted, nor is there an AR-style rifle legally registered to Secor.

---

%20Cover%20Letter%20and%20Schedule_Redacted2.pdf

[9] This safe was not located within the defendant's bedroom in the home, and the defendant lived with his mother at the time. The mother disclaimed any ownership over the firearm.

[10] The date and time stamp on this video indicate it was taken on January 5, 2018, at 10:26 p.m. However, conditions outside indicate this timestamp is probably incorrect, given the sunlight still present.



At the time of arrest, law enforcement officials recovered Secor's wallet, which contained credit and debit cards. Subpoena returns for one of those credit card accounts show Secor is the owner of the card, and over the course of twelve months between December 2019 and November 2020, the card was used to make at least 20 purchases from firearms and military tactical gear retailers. The purchases totaled more than $3,300.

Equally concerning were messages, images, and searches recovered from Secor's electronic devices. On January 12, 2021, an associate of Secor sent him a message, captured on his iCloud, asking "hey bro do you make any Glocks or AR for sale?" Secor responded "Never say anything remotely of that nature on an unsecure line. We are in a civil war. Get telegram and get back to me. The short answer is no."  On January 26, 2021, defendant Secor conducted the following Google search: "can you find a guns owner with serial number." An image on Secor's iCloud of a computer screen that showed Secor logged into a webpage, with digital instruction manuals for 3-D printing firearms components also present in the photograph. The night before

Secor was arrested for the instant offense, on February 16, 2021, Secor and an associate were sending text messages regarding "ultra secret" "future operations."

Given that defendant Secor had access to a ghost gun and likely an unregistered AR-style rifle, other weapons and military-style armor, and possibly the ability to build other firearms, all while supporting political violence, including his participation in the attack on the Capitol on January 6, the government believes Secor poses significant danger to the community. Secor's history of adhering to extremist ideology and easy access to weapons, including firearms, warrants serious consideration when fashioning an appropriate sentence.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Secor's criminal conduct, corruptly obstructing of an official proceeding, is the epitome of disrespect for the law. When Secor entered the Capitol grounds and the Capitol itself, it was abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general,

---

[11] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

D.     **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[12] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of the recommended incarceration. Although Secor has now accepted responsibility for his actions, his statements after January 6 were those of a man girding for another battle. *See United States v. Matthew Mazzocco*, 21-cr-054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Secor's own statements that "we are in a civil war" and tweets after the attack on the Capitol demonstrate that this defendant's sentence must be sufficient to provide specific deterrence from committing future crimes.

39

E.       **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Secor and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 1512 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

Relatively few Capitol Riot cases involving the charge of conviction here—18 U.S.C. § 1512(c)(2)—have proceeded to sentencing. Less than 10 have been sentenced subsequent to pleas, and those cases encompass a wide range of conduct.

In the case of *United States v. Joshua Pruitt*, 21-cr-23, Judge Kelley sentenced the defendant to 55 months in prison. This sentence was roughly in the middle of Pruitt's advisory Guidelines range, 51-63 months, the same range that defendant Secor faces here. Pruitt pleaded guilty to one count of 18 U.S.C. § 1512(c)(2). Pruitt's Guidelines included both enhancements

under 2J1.2(b) for threatening physical injury and substantial interference with the administration of justice despite the fact that Pruitt did not directly engage in violent or destructive conduct himself.

At sentencing, Judge Kelley found that Pruitt was at the forefront of the mob on January 6 and that he "amped up" the crowd. Pruitt's offense conduct was aggravated by the fact that he was a member of the Proud Boys and that he engaged in preplanning and coordination with the Proud Boys. While not apples to apples, defendant Secor's adherence to the America First movement, which at least, in part, brought him to the Capitol on January 6, compares with the "White chauvinist" ideology espoused by the Proud Boys. Notably, Pruitt's Guidelines were elevated due to his criminal history, which put him in Category III as opposed to Secor's Category I. But Secor's base offense level is elevated by the additional two-point enhancement for obstruction under U.S.S.G. § 3C1.1 for destruction of evidence.

In the *Rubenacker* case, 21-cr-193, Chief Judge Howell sentenced the defendant to 41 months, the bottom of his advisory Guidelines range, which was 41-51 months. Though Rubenacker pleaded guilty to the indictment in his case—which included a charge of 18 U.S.C. § 1512(c)(2)—without a plea agreement, he did receive credit for acceptance of responsibility. Without that, his Guidelines range would have been 57-71 months. Rubenacker's Guidelines likewise included both enhancements under 2J1.2(b) despite the fact that Rubenacker did not directly engage in violent or destructive conduct. Chief Judge Howell found that Rubenacker's "physical movements inside the Capitol communicated threats to law enforcement" and his "yelling and taunting at the officers … was threatening conduct, regardless of what he precisely said and whether those words contained threats of physical injury to those officers" in the context of an angry mob confronting police and refusing to comply with directions to leave the area.

42

*United States v. Duke Wilson*, 21-cr-345 (RCL), *United States v. Jacob Chansley*, 21-cr-3 (RCL), *United States v. Scott Fairlamb*, 21-cr-12 (RCL), and *United States v. Marshall Neefe and Charles Bradford Smith*, 21-cr-562 (RCL) each faced advisory Guidelines ranges of 41-51 months following their guilty pleas involving a lead charge of 18 U.S.C. § 1512(c)(2) or 18 U.S.C. § 1512(k). Judge Lamberth, who sentenced all five, imposed incarceration sentences of 41months for all, except Duke Wilson, who received 51 months.[13]

Mitigating factors present in three § 1512(c)(2) cases—*United States v. Richard Michetti*, 21-cr-232 (CRC)(defendant was sole financial support for his minor child and proactively engaged in post-offense rehabilitation), *United States v. Matthew Ryan Miller,* 21-cr-75 (RDM)(defendant's age, possible intoxication at time of offense, and "otherwise exemplary behavior" warranted variance), and *United States v. Paul Allard Hodgkins*, 21-cr-188 (RDM)(defendant took "exceptionally" early guilty plea, made no threats or acts of violence, and took significant steps taken towards rehabilitation)—resulted in non-Guidelines sentences. Additionally, two of those three defendants, Michetti and Hodgkins, did not face an 8-point enhancement under U.S.S.G. § 2J1.2(b)(1)(B). No similar constellation of mitigating factors is present here.[14]

The government, of course, is aware of this Court's sentence after trial in *United States v. Timothy Hale-Cusanelli,* 21-cr-37 (TNM), in which this Court found the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2) did not apply. In this Court's view, Congress's Electoral

---

[13] Defendant Wilson was present in the Lower West Terrace tunnel and used a PCV pipe to attack one of the U.S. Capitol Police officers defending the building there. *Untied States v. Duke Wilson*, 21-cr-345 (RCL), ECF No. 29, at 11-12.

[14] The government acknowledges this defendant's age is similar to that of defendant Miller. However, that alone is not sufficient to warrant a variance from the guidelines here.

College certification vote on January 6, 2021, did not involve the "administration of justice." *See*, *United States v. Hale-Cusanelli*, Sent. Hrg. Tr. at 50-55. The Court thus calculated the applicable Offense level for Hale-Cusanelli's Section 1512(c)(2) offense as 16, and his Guidelines range as 21 to 27 months. *Id*. at 55. From that Guidelines range, this Court imposed an upward variance to a sentence of 48 months incarceration, because: in joining the January 6 riot, Hale-Cusanelli "participated in a national embarrassment" and his "actions on that day were extremely troubling," *id.* at 79; the defendant intended to stop the certification vote on January 6, *id*. at 80; his taunts to a Capitol Police Officer who was bravely doing her duty on January 6th in the face of overwhelming rioters and violence was "appalling," *id.*; he made "degrading comments about women, Jews and minorities," "infamously posed as Hitler," and said that "babies born with deformities should be shot in the forehead," *id.* at 80-81. This Court also noted that, although the enhancements under § 2J1.2(b) did not technically apply, Hale-Cusanelli did "substantially interfere" with an official proceeding and his interference with a police officer's attempt to arrest a rioter required additional punishment, if not the full 8 levels un § 2J1.2(b)(2). *Id.* at 85-86.

The Court's conclusion in *Hale-Cusanelli* that its calculation of the applicable Guidelines range did not sufficiently capture the extent of Hale-Cusanelli's criminal conduct on January 6, and that the application of all the factors under 18 U.S.C. § 3553(a) required an upward variance, applies equally here. Secor's conduct on January 6, involving not only his physical exertions in overcoming police efforts to prevent rioters from spilling through the East Rotunda Doors, but his invasion of the office suite of the Speaker of the House, and the Senate Chamber, planting himself in the chair of the President of the Senate, were egregious efforts to prevent the certification vote. Secor's efforts to disrupt the were more extensive than many other defendants who have been

convicted of violation so Section 1512(c)(2). *See, e.g.*, *United States v. Duke Wilson*, 21-cr-345 (RCL)(defendant never made it inside the building); *United States v. Scott Fairlamb*, 21-cr-12 (RCL)(defendant only briefly inside the building); *United States v. Jacob Chansley*, 21-cr-3 (RCL)(defendant not charged with violent conduct); *United States v. Paul Allard Hodgkins*, 21-cr-188 (RDM)(defendant not charged with violent conduct); *United States v. Richard Michetti*, 21-cr-232 (CRC)(defendant not charged with violent conduct).

If an upward variance was warranted for Hale-Cusanelli, it is warranted here as well. Because the government believes that its calculations of the Sentencing Guidelines range, with the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and (b)(2) would result in a sentence that is sufficient but not more serious than necessary to account for all of Secor's offense and relevant conduct in this case, it recommends a sentence of incarceration of 57 months for Secor, even if this Court declines to apply the enhancements under U.S.S.G. § 2J1.2(b)(1)(B) and § 2J1.2(b)(2),

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[15] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[15] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. There are no named individual victims in defendant Secor's case. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that defendant Secor must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role defendant Secor played in the riot on January 6.[16] Plea Agreement at ¶ X. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55"[17] in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Defendant Secor's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 116.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 57 months, 3 years of supervised release, restitution of $2,000, and the mandatory $100 special assessment for each count of conviction.

---

[16] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[17] This number reflects what is in the plea agreement, even though the current estimate is higher-- $2,734,783.15.

Dated: October 12, 2022

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY: ____/s/_____
KIMBERLY L. PASCHALL
Assistant United States Attorney
Capitol Siege Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C. 20530
202-252-2650
Kimberly.Paschall@usdoj.gov